In the

# United States Court of Appeals

## For the Seventh Circuit

No. 24-2572

CHRISTOPHER GEORGE PABLE,

*Plaintiff-Appellant,*

*and*

TIMOTHY A. DUFFY,

*Appellant,*

*v.*

CHICAGO TRANSIT AUTHORITY
and CLEVER DEVICES, LTD.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:19-cv-07868 — **Robert W. Gettleman**, *Judge.*

ARGUED APRIL 16, 2025 — DECIDED JULY 28, 2025

Before SYKES, *Chief Judge*, and ST. EVE and JACKSON-AKIWUMI, *Circuit Judges.*

JACKSON-AKIWUMI, *Circuit Judge.* In this appeal, an attorney and client seek review of the court order sanctioning both

of them for discovery misconduct. The case began when
Christopher Pable, a software engineer with the Chicago
Transit Authority (CTA), discovered a cyber-security vulner-
ability. He reported the vulnerability to his supervisor, Mike
Haynes, who then tested it on another city's transit system.
These events were brought to the CTA's attention by Clever
Devices, Ltd., a software development company that pro-
vided the CTA with real-time transit tracking and updates.
Once alerted by Clever Devices, the CTA began the process of
terminating Pable and Haynes. At the time, Clever Devices
had a multi-million-dollar annual contract with the CTA.

After Pable was fired, he sued the CTA and Clever Devices
for violating the whistleblower protections in the National
Transit Systems Security Act, 6 U.S.C. § 1142. Discovery bat-
tles ensued. The CTA and Clever Devices ultimately won—
while still in the discovery phase. The district court awarded
them six figures in expenses and dismissed Pable's complaint
based on the deletion of evidence and the misconduct of
Pable's attorney, Timothy Duffy. Pable and Duffy appeal that
order. Mindful of the considerable deference we afford dis-
trict courts in their decisions about discovery sanctions, we
affirm.

## I

As a software engineer with the CTA, Christopher Pable
supported the agency's implementation of the BusTime sys-
tem, a real-time transit tracking application developed by
Clever Devices. On August 17, 2018, Pable discovered a secu-
rity vulnerability in the system: a "Skeleton Key" that granted
unauthorized access to BusTime systems operated by various
transit authorities and enabled the posting of public alerts to
those systems.

Pable reported the vulnerability to his supervisor, Mike Haynes, that same day. Then, at Haynes's direction, Pable configured a test application to see if the Skeleton Key worked on another transit agency's system. Haynes then used that test application to post a service alert to the Dayton, Ohio, Bus-Time system. The alert, which duplicated a real bridge closure notice, was automatically posted to Dayton Regional Transit Authority's (RTA) Twitter feed. Haynes disclosed the test to Dayton RTA the next business day, August 20, and accepted full responsibility for initiating it. Dayton RTA officials expressed concern but did not pursue legal action, and one representative acknowledged the test's value in exposing the security risk.

The same day Haynes disclosed the test to Dayton RTA—August 20—he reported it and the Skeleton Key to Craig Lang of Clever Devices. Lang responded critically and stated that the incident had affected one of the company's clients. More than a month later, on October 22, Clever Devices sent CTA President Dorval R. Carter Jr. a letter asserting that Haynes and Pable had "exploited" the vulnerability, breached the CTA's contract with Clever Devices, and possibly violated state and federal laws. Lang and Clever Devices' legal counsel later admitted under oath that they had no personal knowledge of what Pable had done and could not identify any laws or specific contract provisions that had been violated.

The same day CTA officials received the letter from Clever Devices, October 22, they decided to terminate Haynes and Pable. Internal emails ordering the deactivation of their employee badges proved as much, referring to Pable and Duffy as the "employees that [CTA staff] are separating today."

Despite this, both employees initially were told only that they were being placed on administrative leave, with no reference to the Clever Devices letter or the Skeleton Key incident. Suspecting that the forced leave might be related to an anticipated Family and Medical Leave Act claim, Pable contacted two attorneys on October 29.

At some point after placing Pable and Haynes on leave, the CTA notified them that they would be interviewed at CTA headquarters. On November 2, Pable and Haynes met at a Starbucks to discuss the impending interviews. Haynes testified that during this meeting he decided to delete his entire conversation thread with Pable on Signal, an encrypted messaging application, because he thought the messages were personal and the CTA had not asked him to preserve them. Pable testified that he did not ask Haynes to delete the messages, and his own messages disappeared after Haynes deleted the thread.

At the November 2 interview at CTA headquarters, notes show, Pable consistently denied conducting the Dayton test himself and said that Haynes had made that decision against his advice. In a deposition taken later, one of the interviewers, Marie Marasovich from CTA Human Resources, revealed that the CTA had already decided to terminate Pable and Haynes before the interviews commenced. She further testified that, after the interview, she recommended that Pable not be fired, but she was not the final decisionmaker.

Pable later sued the CTA and Clever Devices (together "the defendants") under the National Transit Systems Security Act, 6 U.S.C. § 1142, alleging that he was terminated in retaliation for reporting a security vulnerability. The CTA responded by filing a counterclaim under the Computer Fraud

and Abuse Act, alleging that Pable had configured a "dooms-day" feature on his work computer that allowed him to wipe it remotely.[1] From there, the parties quickly descended into a protracted discovery battle that produced limited, but notable, evidence.

Most importantly, the parties learned that Pable and Haynes had used Signal to communicate about "what to do next" after the Dayton test. Pable testified that he used the application because it was more secure than text messaging and saved storage space on his phone. The record is silent on whether the CTA knew that Pable and Haynes were using Signal to communicate about their work or whether the CTA approved the use of Signal generally.

Pable's explanations for the deletion of his Signal messages on November 2 evolved over time. Initially, Pable testified that the pre-November 2 messages vanished because Haynes deleted them from Haynes's device. The CTA disputed this, providing an affidavit from Signal's Chief Operating Officer stating that, at that time, one user's deletion of specific messages did not remove those same messages from another user's device. Confronted with this affidavit and a request for sanctions, Pable filed his own affidavit to explain that he had specially configured the Signal application on his device to delete threads when other users, like Haynes, deleted the entire thread. He added that he enabled that

---

[1] The district court later dismissed this counterclaim on Pable's motion for judgment on the pleadings because it was foreclosed by Supreme Court precedent. Specifically, the district court concluded that *Van Buren v. United States*, 593 U.S. 374 (2021), forecloses Computer Fraud and Abuse Act claims based on the misuse of authorized access, as opposed to exceeding authorized access.

functionality for security reasons. The CTA, noting that Pable had not mentioned this explanation during his depositions, viewed this as a later-developed justification unworthy of credence.

The Signal saga did not end there. The CTA also learned during discovery that another group of Signal messages were lost. Specifically, Pable and Haynes had continued to communicate via Signal after their November 2, 2018, meeting. But nearly a year later, on October 29, 2019, Pable activated the "disappearing messages" feature in his Signal thread with Haynes. This caused the messages in that conversation to automatically delete twenty-four hours after being read by the recipient.

As the Signal issues unfolded, the CTA requested a forensic image of Pable's phone to recover, among other information, the missing Signal messages. Pable's counsel, Timothy Duffy, initially resisted, citing privacy concerns, but eventually agreed after extensive negotiation. On October 31, 2020, Pable produced the first image of his phone. The CTA's expert, Nathan Binder, determined the image contained only 0.2 GB of user data, lacked messages from third-party applications, and omitted photos, browsing history, and other key categories of information. Duffy initially insisted that the image was complete but later acknowledged that the vendor might have imaged only relevant portions based on search terms. In a fight over whether a second imaging should be conducted, Duffy stated that he had instructed a third-party vendor, Quest Consultants International, to collect data based on agreed search terms and believed that the image was complete in terms of producing relevant information.

Duffy's representations unraveled quickly. First, Dan Jerger, a Quest employee, testified that Duffy's imaging instructions to Quest were limited to certain search terms and date ranges—rather than a full forensic image. Second, after another image was ordered, the CTA's vendor recovered 25 GB of data—much more than the 0.2 GB earlier produced by Duffy. Remarkably, the CTA noted that the second image included discussions about the Skeleton Key vulnerability and other issues relevant to Pable's suit. The second image, however, did not include any post-October 29, 2019, Signal messages between Pable and Haynes.

The limited information recovered from the second imaging was discovered through much effort, and the defendants moved for dismissal of the complaint and sanctions accordingly. They argued that Duffy unreasonably multiplied the proceedings through misrepresentations about the completeness of productions and failures to correct the record. They also argued that Pable failed to take reasonable steps to preserve three categories of Electronically Stored Information (ESI), including: (1) Signal messages exchanged with Haynes before November 2, 2018; (2) Signal messages exchanged after October 29, 2019; and (3) data on Pable's personal cell phone.

The magistrate judge entered a report and recommendation finding in the defendants' favor on those issues. The district court adopted the recommendation, dismissed Pable's complaint with prejudice, and imposed a series of monetary sanctions. First, the court awarded the CTA sanctions pursuant to Federal Rule of Civil Procedure 37(e) for Pable and Duffy's failure to preserve the relevant ESI. The penalty was $75,175.42, equally split between Pable and Duffy. Second, the court ordered Duffy to pay an additional $53,388 under 28

U.S.C. § 1927 for unreasonably and vexatiously multiplying the proceedings. Third, the court ordered Duffy to pay another $21,367 under Rule 37(a)(5) to compensate the CTA for having to file a motion to compel.

On appeal, Pable and Duffy seek reversal of the dismissal, vacatur of the monetary sanctions, return of the amounts they paid to satisfy the judgment, and remand to a different district judge for further proceedings. The defendants, on the other hand, ask us not only to affirm the district court's decisions, but also to impose additional sanctions on appeal.

## II

The district court sanctioned Pable and Duffy under several distinct authorities. We start with the most consequential of the sanctions: the dismissal of Pable's complaint under Federal Rule of Civil Procedure 37(e). We then evaluate the various monetary sanctions imposed under Rule 37(e), Rule 37(a)(5), and 28 U.S.C. § 1927.

### A. Dismissal

On appeal, Pable challenges the district court's decision to dismiss his complaint as a sanction under Rule 37(e). The Rule provides for dismissal if a court finds that a party failed to preserve ESI "with the intent to deprive another party of the information's use in the litigation." FED. R. CIV. P. 37(e)(2)(C).

Generally, we review discovery decisions for abuse of discretion. *Wanko v. Bd. of Trs. of Ind. Univ.*, 927 F.3d 966, 969 (7th Cir. 2019). Additionally, we review factual findings for clear error as noted below. S*ee post*, at 10, n.2. This deferential review extends to decisions about discovery sanctions. *Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 627 (7th Cir. 2018). "Under that standard, 'the district court's decision is to be overturned

only if no reasonable person would agree with the trial court's ruling.'" *REXA, Inc. v. Chester*, 42 F.4th 652, 671 (7th Cir. 2022) (quoting *Aldridge v. Forest River, Inc.*, 635 F.3d 870, 875 (7th Cir. 2011)). Pable has not cleared this high hurdle.

When asked by the defendants to dismiss Pable's action, the magistrate and district judges undertook reasoned analyses. The district court ultimately found that Pable intentionally spoliated two categories of ESI and dismissal was appropriate to remedy the resulting prejudice. There is, to be sure, some uncertainty about exactly how the messages before November 2, 2018, were deleted from Pable's phone. And, on appeal, Pable seizes upon that uncertainty, arguing that the district court clearly erred in finding that he intentionally spoliated the ESI.

In addressing that argument, we look to the record. Haynes and Pable initially testified that Haynes alone deleted the conversation thread, and Pable testified that he believed that the deletion of the *thread* on Haynes' phone caused the messages to be deleted from his phone as well. Although Pable's explanation is at least plausibly consistent with the affidavit from Signal's Chief Operating Officer (stating that Signal did not provide the ability for a single user to unilaterally and permanently delete *specific* messages for all users in a thread), the district court was within its discretion to not credit that explanation. After all, Pable's explanation changed over time (first claiming that Haynes deleted the messages unilaterally, then adding that Pable had specifically configured the Signal application on his device to make a unilateral deletion possible). This evolution is notable because Pable made no mention of a custom configuration on his own phone when he offered his initial explanation, even though he would

have known of that at the time and it would have been relevant to the deposition questions. Further, Pable offered no evidence other than his affidavit that such a configuration of Signal existed or was installed on his phone. Moreover, Pable's explanation arrived only after he read the affidavit from the Signal COO refuting his prior explanation.

The district court also reasonably found that Pable's duty to preserve those pre-November 2 messages was triggered prior to their deletion. Pable had reached out to attorneys about his termination days earlier on October 29, 2018. Then, in a follow-up email to one attorney the next day, Pable showed awareness that the CTA's rationale for terminating him was relevant, writing "I think they are trying to find any reason to terminate me so I cannot take my FMLA and prevent payment of benefits." And since he and Haynes were being interviewed at the same time, he must have realized that his actions regarding the Dayton test were at issue. These events, a factfinder could reasonably conclude, should have put him on notice that he needed to preserve the messages. Despite that notice, a factfinder could reasonably conclude, Pable deleted (or knowingly allowed Haynes to unilaterally delete) the messages. Although a different factfinder might have reached a different conclusion, the district court did not clearly err[2] in finding that Pable intentionally destroyed the ESI at issue.

---

[2] We have not yet addressed the standard of review for a district court's intent finding for purposes of Rule 37(e)(2)(C). Looking to Rule 37(e)(2) more broadly, other circuits have applied the clear error standard to that finding. *See, e.g., Jones v. Riot Hosp. Grp. LLC*, 95 F.4th 730, 734–35 (9th Cir. 2024); *Skanska USA Civ. Se. Inc. v. Bagleheads, Inc.*, 75 F.4th 1290, 1311, 1314 (11th Cir. 2023*); Ball v. George Washington Univ.*, 798 F. App'x

Pable makes several other arguments about the dismissal sanction. First, he argues that he had a right to an evidentiary hearing because the district court had to resolve disputed facts and assess Pable's credibility before dismissing his complaint. We review a district court's decision not to hold a hearing for abuse of discretion. *See REXA, Inc.*, 42 F.4th at 672. In this case, we see none because the court's decision was based on its evaluation of undisputed, objective evidence: Pable allowed the messages to be deleted, his explanations for how exactly the messages were deleted evolved over time, and he took no reasonable steps to preserve the messages. The court was well within its discretion to conclude that an evidentiary hearing would not have assisted it in reaching a decision. *See Kapco Mfg. Co. v. C&O Enters., Inc.*, 886 F.2d 1485, 1495 (7th Cir. 1989) ("[T]he right to a hearing in these circumstances is obviously limited to cases where a hearing could assist the court in its decision."); *see also REXA, Inc.*, 42 F.4th at 672–73 ("[A] court does not abuse its discretion by not conducting 'an evidentiary hearing that would only address arguments and materials already presented to the court in the parties' briefings.'" (quoting *Royce v. Michael R. Needle P.C.*, 950 F.3d 481, 487 (7th Cir. 2020))). Moreover, Pable was given the opportunity to provide briefing on any of the arguments that he would have made at a hearing. For this reason too, we cannot say that the district court abused its discretion in imposing the

654, 655 (D.C. Cir. 2020). Further, looking to how our circuit reviews findings of bad faith more generally, we have held that the standard is clear error. *Donelson v. Hardy*, 931 F.3d 565, 567, 569 (7th Cir. 2019) (reviewing the dismissal of a complaint for obstruction of discovery and holding that "[s]anctions under all three sources are justified by bad-faith conduct, a finding that the district court made and that we review for clear error"). We now adopt the clear error standard for purposes of Rule 37(e)(2)(C).

sanction of dismissal without first holding an evidentiary hearing or submitting the credibility question to a jury.[3]

Skipping a hearing, Pable argues, was also inconsistent with our decisions in *Kapco* and *McIntosh v. Wexford Health Services*, 987 F.3d 662 (7th Cir. 2021). But neither *McIntosh* nor *Kapco* do the work Pable suggests they do. Our court ruled *against* the *Kapco* appellants on the very issue for which Pable cites to it for support. There, we determined that the sanctions were proper and that due process did not require a hearing where the sanctioned attorney was given notice and an opportunity to respond before sanctions were imposed. *Kapco*, 886 F.2d at 1495. And *McIntosh* is entirely inapposite. Our holding in *McIntosh*—remanding with instructions to the district court to hold an evidentiary hearing before rejecting the magistrate judge's credibility findings—turned on our reading of the Federal Magistrate Act and its constitutional implications. 987 F.3d at 664–66. *McIntosh* is limited to that context, and should not be read to imply that litigants subject to sanctions must be afforded an evidentiary hearing before a district court can make credibility findings related to those sanctions.

Second, Pable argues that the district court abused its discretion in failing to consider whether the severity of the dismissal sanction was appropriate. According to Pable's brief on appeal, the district court provided "no analysis of the relationship between Pable's claims, the CTA's defenses, and the lost Signal messages." The record, however, shows that the

---

[3] From our holding that an evidentiary hearing was not required, it follows that Pable was not entitled to present his defense to a jury either. There is no authority to support Pable's argument that he was entitled to a jury on the question of sanctions. We have never acknowledged such a right in this context, and we decline to do so now.

district court did make the necessary appropriateness finding before imposing its selected remedy, which the court acknowledged was "harsh." First, the magistrate judge's report dedicated several pages to the appropriateness of dismissal and outlined four considerations that supported dismissal, including the seriousness of the spoliation, the misrepresentations related to the spoliation, the importance of the spoliated ESI, and the need to redress the harm inflicted by the spoliation. Likewise, the district judge reasoned that a "lesser sanction would not be sufficient to cure the prejudice that [the] CTA has suffered due to the spoliation because it is impossible to determine the full extent of the spoliation." *Pable v. Chi. Transit Auth.*, No. 19 CV 7868, 2024 WL 3688708, at *9 (N.D. Ill. Aug. 7, 2024) (citation modified). The district court considered lesser sanctions, such as adverse instructions or presumptions, but concluded that they could not "eliminate—or even substantially mitigate—the prejudice" to the CTA. *Id.* Given these findings, we cannot in our deferential review say that the district court abused its discretion in determining the severity of the sanction.

Lastly, Pable argues that the district court abused its discretion by basing its decision to dismiss Pable's complaint solely on Duffy's conduct. But to the extent the district court considered Duffy's conduct, it did so only where Duffy acted as Pable's representative (meaning that Duffy's actions were directly attributable to Pable). *See Johnson v. Gudmundsson*, 35 F.3d 1104, 1117 (7th Cir. 1994) ("While it is true that a court is slow to attribute the errors of counsel to its client, we also have held that a party who chooses his counsel freely should be bound by his counsel's action." (citation modified)). Further, Pable identifies no authority to support his position that the court's approach is reversible error. Rule 37 expressly

provides for dismissal as a remedy. On the record before us, we see no reason to limit Rule 37 in the manner that Pable seeks.

### B. Monetary Sanctions, Fees, and Costs

We turn to the monetary sanctions Pable and Duffy face. The district court ordered them jointly to pay $75,175.42 under Rule 37(e), and then Duffy to pay an additional $21,367 and $53,388 under Rule 37(a)(5) and 28 U.S.C. § 1927, respectively. We review a district court's entry of sanctions for abuse of discretion and its factual findings for clear error. *Brown v. Columbia Sussex Corp.*, 664 F.3d 182, 190 (7th Cir. 2011). "This court need only inquire whether any reasonable person could agree with the district court's sanction award." *Kapco Mfg. Co.*, 886 F.2d at 1491.

### 1. Rule 37(e)

As a curative measure under Rule 37(e)(1), the district court ordered Pable and Duffy to pay the reasonable attorney's fees and costs incurred by the CTA in bringing its Rule 37(e) motion. Federal Rule of Civil Procedure 37(e)(1) provides that a district court may, upon finding that the failure to preserve ESI has prejudiced a party, "order measures no greater than necessary to cure the prejudice."

As noted above, the district court did not abuse its discretion in finding that the defendants were prejudiced by the Pable's failure to preserve the relevant ESI. And, beyond dismissing the action, the district court found that an additional monetary award was necessary to cure the resulting prejudice. This, the district court reasoned, was necessary because the spoliation impacted not only the defendants' ability to mount a defense but also caused them to incur fees and costs

in litigating the spoliation itself. Specifically, the defendants spent $75,175.42 ($71,458.78 in attorney's fees and $3,716.64 in costs) to take part of Pable's second deposition, file several discovery motions and a subpoena, and brief the Rule 37 motion. Thus, dismissal alone would not have made them whole.

Pable and Duffy argue on appeal that the district court's decision to impose a monetary penalty under Rule 37(e)(1) was erroneous because the rule does not authorize monetary sanctions. They note that the rule does not expressly provide for expenses as a sanction, unlike other parts of Rule 37, including 37(a)(5), 37(b)(2)(C), 37(c)(1)(A), and 37(d)(3), which expressly authorize expenses as a sanction. And they observe that our circuit has never endorsed the imposition of monetary sanctions under Rule 37(e)(1).

Although Pable and Duffy are correct that our court has not addressed this question, their argument is unpersuasive. The text of Rule 37(e)(1) affords judges wide latitude: they "may order measures no greater than necessary to cure the prejudice." FED. R. CIV. P. 37(e)(1). Read naturally, this permits the district court to award fees and costs so long as the award is reasonably necessary to cure the prejudice.

The commentary to Rule 37(e)(1) supports this reading of the text. The Advisory Committee on Rules notes that:

> The range of [authorized] measures is quite broad if they are necessary for this purpose. There is no all-purpose hierarchy of the severity of various measures; the severity of given measures must be calibrated in terms of their effect on the particular case.

FED. R. CIV. P. 37(e)(1), Advisory Committee Note, 2015 Amendment. The same note provides examples of measures that would be inappropriate under Rule 37(e)(1), including "an order striking pleadings related to, or precluding a party from offering any evidence in support of, the central or only claim or defense in the case." *Id.* The Advisory Committee did not include monetary sanctions when illustrating inappropriate measures. Thus, as an issue of first impression, we conclude that the district court did not err as a matter of law in imposing monetary sanctions under Rule 37(e)(1).

### 2. Rule 37(a)(5)

The CTA petitioned the district court under Rule 37(a)(5) for additional attorney's fees ($22,489.50) and costs ($12,189.51) incurred in connection with its motion to compel a second forensic imaging of Pable's phone. The district court partially granted that request and ordered Duffy to pay a revised sum of $21,367 because, the court concluded, Duffy's opposition to the motion was not substantially justified. On appeal, Duffy argues that the district court erred in several respects when ordering that payment.

Rule 37(a)(5) provides that, upon granting a motion to compel, a court *must* require the losing party, relevant deponent, or responsible attorney "to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." FED. R. CIV. P. 37(a)(5)(A). The Rule provides for three exceptions to that requirement, one of which is contested here: courts must not order the payment if "the opposing party's nondisclosure, response, or objection was substantially justified." FED. R. CIV. P. 37(a)(5)(A)(ii).

We have previously reasoned that, for purposes of Rule 37(a)(5), "substantially justified" has the same meaning as in the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A). *See Rickels v. City of South Bend*, 33 F.3d 785, 787 (7th Cir. 1994) (addressing Rule 37's instructions, now found at Rule 37(a)(5)(B), when a motion to compel is denied) (referencing *Commissioner of INS v. Jean*, 496 U.S. 154 (1990)). And the Supreme Court has reasoned that, for purposes of the Equal Access to Justice Act, "[a] position is 'substantially justified' if it 'has a reasonable basis in law and fact,'" similar to Rule 11's "inquiry [into] whether a pleading is 'well grounded in fact' and legally tenable." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 403 (1990) (quoting *Pierce v. Underwood*, 487 U.S. 552, 566 n.2 (1988)). Thus, to persuade us that opposition to a motion to compel was substantially justified, a party must show there was a genuine dispute and its opposition had a reasonable basis in law and fact.

In light of that standard, we conclude that the district judge did not clearly err in finding that Duffy's opposition to the motion was not substantially justified. The CTA needed to seek the second imaging only because Duffy originally instructed Jerger not to complete a full image of Pable's phone. On appeal, Duffy argues that his opposition to the motion to compel a second imaging was justified on two bases: (1) "the second imaging was unlikely to yield any relevant information"; and (2) the request for a second imaging "was based on an erroneous assumption that the first image had been limited in some way to exclude relevant communications." Neither of those two bases is supported by the record. First, the second imaging revealed much more information than the first: It produced 25 GB of data where the first had produced only 0.2 GB, and it revealed discussions about the Skeleton

Key vulnerability and other information relevant to Pable's suit that had not yet been produced by Pable. Second, the first imaging was indeed limited in a manner that excluded relevant communications. This is evidenced by Jerger's testimony that Duffy instructed him to produce a limited "image." Because Duffy's two contentions do not carry water and because we owe considerable deference to the district court, we cannot find an abuse of discretion here either.

Duffy raises two additional challenges to the Rule 37(a)(5) sanctions. He asserts that the CTA failed to respond to Pable and Duffy's objections to the magistrate judge's sanctions order, and thereby waived any argument to the district court that sanctions should be imposed. He also asserts that the district court abused its discretion in failing to consider that the dismissal of the CTA's counterclaim rendered some of the information produced by the second imaging irrelevant.

Neither of those two additional arguments can succeed. As for the district court's purported failure to consider the import of the counterclaim dismissal, we see two shortcomings in Duffy's argument. First, the district court was aware that the counterclaim had been dismissed and considered this to the extent that it adopted the magistrate judge's report and recommendation, which rejected Duffy's position about the effect of the dismissal. Second, the dismissal of the counterclaim makes no difference here because Duffy's opposition to the motion to compel was nevertheless not substantially justified. Regardless of whether the information produced by the second imaging was relevant to the counterclaim, it was still relevant to the CTA's defense to Pable's whistleblower retaliation claim. The information, after all, included discussions

about the Skeleton Key, and Duffy had no reason to oppose its production.

On the waiver issue, we also see two shortcomings. First, the CTA did not waive the issue below; indeed, the CTA expressly argued that Duffy's objections to the award of fees and costs under Rule 37(a)(5) should be overruled. Second, Duffy waived this waiver argument by not presenting it to the district court. *United States v. Morgan*, 384 F.3d 439, 443 (7th Cir. 2004) ("A waiver argument, after all, can be waived by the party it would help….").

### 3. Section 1927

We reach the final sanction at issue in this appeal. The district court ordered Duffy to pay $53,388 under 28 U.S.C. § 1927 for what the district court concluded was misconduct related to the imaging of Pable's phone. Section 1927 provides that an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927.

The "because of" language requires a causal but-for connection between the attorney's misconduct and the legal fees paid by the opposing party. *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 n.5 (2017); *see also id.* at 109 (describing the kind of causal connection necessary as a "but-for test: The complaining party … may recover only the portion of his fees that he would not have paid but for the misconduct" (citation modified)). Further, § 1927 sanctions require a showing of either subjective or objective bad faith. *Dal Pozzo v. Basic Mach. Co., Inc.*, 463 F.3d 609, 614 (7th Cir. 2006) (collecting cases and

clarifying caselaw). In the § 1927 context, we have observed that "[i]f a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious." *Kapco Mfg. Co.*, 886 F.2d at 1491 (quoting *In re TCI Ltd.*, 769 F.2d 441, 445 (7th Cir. 1985)).

Duffy argues on appeal that § 1927 sanctions were inappropriate because he did not unreasonably and vexatiously multiply the proceedings. He challenges the district court's finding that he made misrepresentations, including by stating that the first image was a "complete image" and by later failing to correct that statement during the dispute over the need for a second imaging.

But the record before us supports the conclusion that Duffy's statements were misrepresentations. To start, he affirmatively represented that the first image was a "complete forensic image," as reflected in an email exchange between Duffy and counsel for the CTA. Indeed, he concedes as much on appeal, noting that, in meet-and-confer discussions and correspondence, "Duffy first represented the image was 'complete' on October 24, 2020." He claims that his answer is taken out of context, but the context is clear as shown by the entire email exchange:

> [CTA:] Pable will produce a complete and searchable forensic image file of his personal cell phone as it was previously imaged by Pable's third-party expert during the course of written discovery in this litigation; as Pable has already had the phone imaged, we would ask that the image be produced by the close of business on October 29, 2020.

> [Duffy:] The image is a complete forensic image; I cannot make any representations about its searchability, which has nothing to do with the imaging process. I am checking on timing and logistics for this, and am just not in a position to confirm the 29th right now.

Duffy also argues that his statements are misrepresentations only if one "literally" interprets them. For example, he agrees that Jerger was not instructed to obtain a "complete image"—because, he continues, Jerger "was never asked to obtain *any* image." This misses the point. Duffy agreed to image the phone and, on June 12, 2020, told counsel for the CTA that he had "imaged Mr. [Pable's] cell phone and [was] in the process of running the search terms." This was a misrepresentation by Duffy's own admission because Duffy did not image the phone and knew that at the time, as Jerger testified and as Duffy acknowledges on appeal. Further, Duffy did indeed fail to correct his misrepresentations. There is no dispute on this point. Rather than correct the misrepresentations and resulting misunderstandings, he opposed each of the CTA's efforts to produce a complete forensic image. Under these circumstances, Duffy cannot surmount the high hurdle of demonstrating that the district court abused its discretion in imposing sanctions under § 1927.

### III

We address one final matter. The CTA asks us to financially penalize Pable and Duffy even more. Specifically, the agency asks us to award it fees for defending on appeal the district court's decision to impose Rule 37(a)(5) sanctions. *See* FED. R. APP. P. 38 (permitting appellate courts to award "just damages and single or double costs to the appellee" for

frivolous appeals). For support, the CTA cites our decision in *Rickels*, which held that "[w]hen the district court awards fees to the prevailing party as of course … the costs of defending the award on appeal are added to that award as of course." 33 F.3d at 787. The CTA argues that it cannot be made whole without being repaid the fees and costs associated with defending the Rule 37(a)(5) award, which was imposed by the district court as a matter of course.

Although we might ordinarily agree with the CTA for the reasons we outlined in *Rickels*, we cannot agree here. Our circuit has few decisions on the issues presented by Duffy's Rule 37(a)(5) challenge in this appeal. Without more developed caselaw, we cannot say that this appeal—unlike the opposition to the motion to compel in the district court—was not "substantially justified." A reasonable attorney in Duffy's position acting in good faith would make some of the arguments that he has made in this appeal. Thus, despite the appropriateness of the district court's award of fees and costs, we decline to impose additional monetary obligations on appeal.

## IV

In an involved and fact-intensive case like this, the deference owed to trial courts is especially important. *See Houston v. C.G. Sec. Servs., Inc.*, 820 F.3d 855, 858 (7th Cir. 2016) ("In reviewing for abuse of discretion, we keep in mind that because the trial court alone has an intimate familiarity with the relevant proceedings it is in a far superior position to pass on an attorney's conduct than a reviewing court." (citation modified)); *Methode Elecs., Inc. v. Adam Techs., Inc.*, 371 F.3d 923, 925 (7th Cir. 2004) ("We review the grant of sanctions with deference because of the familiarity of the trial court with the relevant proceedings."). Here, the district judge and

magistrate judge issued extensive, thorough, and well-reasoned opinions adequately supporting the decision to impose sanctions. The deference we owe them guides our review.

Accordingly, we affirm the district court's judgment and decline to impose further sanctions.

AFFIRMED.